## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
## Case No. 22-80173-CV-MIDDLEBROOKS

EPIC SYSTEMS CORPORATION,

        Plaintiff,

vs.                                   JURY TRIAL DEMANDED

DECAPOLIS SYSTEMS, LLC,

        Defendant.

_____/

## DEFENDANT DECAPOLIS SYSTEMS, LLC'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT FOR DECLARATORY JUDGMENT

Decapolis Systems, LLC ("Defendant" or "Defendant") hereby files this Answer, Affirmative Defenses, and Counterclaims to Plaintiff Epic Systems Corporation's ("Plaintiff" or "Epic") Complaint for Declaratory Judgment ("Complaint").

## PRELIMINARY STATEMENT

1.      Decapolis admits that Plaintiff filed the present declaratory judgment action seeking a determination that U.S. Patent No. 7,490,048 ("the '048 patent") and U.S. Patent No. 7,464,040 (the '040 patent) (collectively referred to as the "Patents-in-Suit") are invalid and not infringed by Plaintiff.  The remainder of the allegations call for a legal conclusion for which an answer is not warranted.

2.      Decapolis admits that it filed a suit against Epic in the Western District of Texas accusing Epic of infringing the Patents-in-Suit, and that suit was dismissed.

## JURISDICTION

3.     Decapolis admits that the action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and under the Patent Laws of the United States, 35 U.S.C. §§ 1, *et seq*.

4.     Decapolis admits this allegation.

5.     Decapolis admits this allegation except to the extent that it was incorporated.

6.     Decapolis admits that it filed a suit against Epic in the Western District of Texas accusing Epic of infringing the Patents-in-Suit, and that suit was dismissed. Decapolis denies all remaining allegations, including that it improperly sued Epic.

7.     Decapolis admits that it filed lawsuits against Epic's customers, alleging infringement of the Patents-in-Suit, in part, by use of Epic's software and systems. Decapolis denies otherwise all other allegations.

## VENUE

8.     Admitted.

## PARTIES

9.     Decapolis does not deny but cannot admit this allegation.

10.     Decapolis admits this allegation, except that it denies that it is a so-called non-practicing entity.

## FACTS

### The '040 Patent

11.     Decapolis admits this allegation..

12.     Decapolis admits the abstract describes the '040 patent.

13.     Decapolis admits this allegation.

### The '048 Patent

14.     Decapolis admits this allegation.

15.     Decapolis admits the abstract describes the '048 patent.

16.     Decapolis admits this allegation.

### Existence of an Actual Controversy

17.     Decapolis admits this allegation.

18.     Decapolis admits this allegation.

19.     Decapolis admits Epic filed a motion to dismiss for improper venue or to transfer the case to the United States District Court for the Western District of Wisconsin. Otherwise, does not admit or deny.

20.     Decapolis admits it filed an amended complaint.

21.     Decapolis admits the United States District Court for the Western District of Texas issued an order striking Decapolis' amended complaint and ordered it to respond to Epic's motion to dismiss.

22.     Decapolis admits this allegation.

23.     Decapolis admits that it filed lawsuits against Epic's users, alleging infringement of the Patents-in-Suit, in part, by use of Epic's software and systems. Decapolis otherwise denies all remaining allegations.

24.     Decapolis admits that a controversy exists.

25.     Decapolis admits it asserts Epic infringes the Patents-in-Suit, otherwise Decapolis denies all remaining allegations.

**COUNT ONE**
**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '040 PATENT**

26.     Decapolis reasserts and incorporates by reference its responses to paragraphs 1 through 25 of above as though fully set forth herein.

27.     Decapolis admits that a controversy exists among the parties.

28.     Decapolis denies this allegation and demands strict proof thereof.

29.     Decapolis denies this allegation and demands strict proof thereof.  Decapolis further denies that Plaintiff is entitled to any relief whatsoever.

**COUNT TWO**
**DECLARATORY JUDGMENT OF [INVALIDITY OF THE '040 PATENT**

30.     Decapolis reasserts and incorporates by reference its responses to paragraphs 1 through 25 of above as though fully set forth herein.

31.     Decapolis admits that a controversy exists among the parties.

32.     Decapolis denies this allegation and demands strict proof thereof.

33.     Decapolis denies this allegation and demands strict proof thereof.  Decapolis further denies that Plaintiff is entitled to any relief whatsoever.

**COUNT THREE**
**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '048 PATENT**

34.     Decapolis reasserts and incorporates by reference its responses to paragraphs 1 through 25 of above as though fully set forth herein.

35.     Decapolis admits that a controversy exists among the parties.

36.     Decapolis denies this allegation and demands strict proof thereof.

37.     Decapolis denies this allegation and demands strict proof thereof.  Decapolis further denies that Plaintiff is entitled to any relief whatsoever.

## PRAYER FOR RELIEF

Decapolis denies all allegations in Plaintiff's Prayer for Relief, and further denies that Plaintiff is entitled to any relief whatsoever.

## AFFIRMATIVE DEFENSES

1.     **Failure to State a Claim.**  Each count fails to state a claim upon which relief may be granted.

2.     **Unjust Enrichment.**  Plaintiff improperly enriched itself and should not benefit for its improper and illegal acts.

3.     **Validity.**  Decapolis affirmatively pleads that all of the Patents-in-Suit are valid.

4.     **Infringement.**  Decapolis affirmatively pleads that Plaintiff has infringed, including directly (whether individually or jointly) or indirectly (whether contributorily or by inducement), all valid, enforceable claims of the Patents-in-Suit.

5.     **Lack of Standing.**  Plaintiff does not have any right or standing to assert the claims at issue.

6.     **Legal Doctrine.**  Plaintiff's claims against Decapolis are barred by one or more of the equitable doctrines of laches, estoppel, acquiescence, waiver, and unclean hands.

7.     **Reservation.**  Decapolis reserves the right to assert additional affirmative defenses as they become known through additional investigation and/or discovery during the course of this **litigation.**

/ / / / /

/ / / / /

/ / / / /

/ / / / /

## DECAPOLIS SYSTEMS, LLC'S COUNTERCLAIMS

For its counterclaims against Plaintiff Epic Corporation ("Epic"), Counterclaim Plaintiff Decapolis Systems, LLC ("Decapolis) alleges, on information and belief, as follows:

## THE PARTIES

1.      Counterclaim Plaintiff Decapolis Systems, LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business located in Palm Beach County, Florida.

2.      On information and belief, based solely on paragraph 5 of the Complaint as pled by Plaintiff, Epic is a Wisconsin corporation with a place of business in Verona, California.

## JURISDICTION AND VENUE

3.      Decapolis incorporates by reference paragraphs 1-2 above.

4.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338.

5.      Epic has consented to the personal jurisdiction of this Court at least by commencing its action for patent infringement in this District, as set forth in its Complaint.

## PATENTS-IN-SUIT

6.      Decapolis is the sole and exclusive owner, by assignment, of U.S. Patents 7,464,040 and 7,490,048 (hereinafter collectively referred to as "the Decapolis Patents").

7.      By written instruments duly filed with the United States Patent and Trademark Office, Decapolis is assigned all rights, title, and interest in the Decapolis Patents. *Id.* Such Assignments are recorded in the records of the United States Patent and Trademark Office at Reel 055516 and Frame 0027.  As such, Decapolis has sole and exclusive standing to assert the Decapolis Patents and to bring these causes of action.

8.      The Decapolis Patents are valid, enforceable, and were duly issued in full compliance with Title 35 of the United States Code.

9.      Raymond A. Joao is the sole named inventor for the Decapolis Patents.

10.     Mr. Joao is a pioneering inventor. The Decapolis Patents represent substantial technological advancements in the medical billing services industry, which were unconventional at the time of invention. Indeed, the Decapolis Patents have been back-cited in patents issued to well-known industry leaders, including, IBM, Siemens AG, Walgreens, McKesson, and Sony.

11.     Additional companies have benefited from, and been provided notice through, their back-citations to the Decapolis Patents, including the following companies: Atirix Medical Systems, Inc.; IBM Corp.; Bard Peripheral Vascular, Inc.; General Electric Company; C.R. Bard, Inc.; Healthunity Corp., Epic Systems Corp.; Accelere, Inc.; Align Technology, Inc.; Siemens Aktiengesellschaft; Vital Data Technology, LLC; Hospira, Inc.; Medical Present Value, Inc.; PSYWARE GmbH; ICU Medical, Inc.; Elwha LLC; Advanced Healthcare Systems, Inc.; Quality Standards, LLC; Therap Services, LLC; and Devicor Medical Products, Inc.

12.     The Decapolis Patents each include numerous claims defining distinct inventions. No single claim is representative of any other.

13.     The priority date of each of the Decapolis Patents is at least as early as December 12, 1999. As of the priority date, the inventions as claimed were novel, non-obvious, unconventional, and non-routine.  Indeed, the Decapolis Patents overcame a number of specific technological problems in the industry and provided specific technological solutions.

14.     By way of example, as of the date of invention, "Doctors or providers may base their diagnoses and/or treatments, [relying on] patients who usually supply this information on questionnaires or forms just prior to seeing the healthcare provider and/or during a preliminary

interview with the provider." *See* U.S. Patent No. 7,464,040, Col. 1, ll. 52-6. As a result, the "information obtained from these questionnaires or forms, as well as from these preliminary interviews with the providers, may not necessarily result in sufficient, comprehensive, and/or accurate, information being obtained regarding the patient." *Id.*, Col.1, ll. 56-60. Further, as of the date of invention: "there is no guarantee that the same [patient medical history] information will be provided, in a uniform manner, to a next or different provider. As a result, patient information may not be uniformly distributed and/or be available to providers at the point of treatment and/or otherwise." *Id.* "Another problem which exists in the current healthcare system is that doctors or other providers do not always have the latest information and/or research material available to them prior to, and/or during, the diagnosis and/or treatment process." *Id.*, Col. 1, ll. 60-5.

15.     Further, at the time of the invention, it had "been estimated that between 44,000 and 98,000 individuals die in the United States alone, as the result of errors or mistakes made by doctors, healthcare providers, and/or healthcare facility workers. There is no doubt that many of these deaths result from inaccurate and/or erroneous information and/or the lack of the availability of correct and/or up-to-date information." *Id.*, Col. 1, ll. 43-49.

16.     The Decapolis Patents overcame these technological problems by a method or apparatus wherein a "medical doctor will transmit [a] final diagnosis and treatment plan…to [a] central processing computer" and wherein "the central processing computer [sic] will then update the patient's records in the database [sic] so as to include all of the data and information described as being processed and/or generated by the central processing computer [sic], including, but not limited to the patient's symptoms, if any, the examination findings, the information contained in the diagnostic report and the treatment report, the final diagnosis and the prescribed treatment.

Thereafter, operation [sic] will cease [sic]. The patient's records will then be updated and be available for the patient's next treatment and/or diagnosis." *Id.*, Cols. 28, ll. 66-7 and Col. 29, ll. 10-2.

17.     The claims of the Decapolis Patents are patent eligible under 35 U.S.C. §§ 101, 102, 103, and 112, as reflected by the fact that three different Patent Examiners all agreed and allowed the Decapolis Patents over extensive prior art as disclosed and of record during the prosecution of the Decapolis Patents.  *See Stone Basket Innov. v. Cook Medical,* 892 F.3d 1175, 1179 (Fed. Cir. 2018) ("when prior art is listed on the face of a patent, the examiner is presumed to have considered it") (citing *Shire LLC v. Amneal Pharm., LLC,* 802 F.3d 1301, 1307 (Fed. Cir. 2015)); *Exmark Mfg. v. Briggs & Stratton,* 879 F.3d 1332, 1342 (Fed. Cir. 2018).

18.     Moreover, any arguments relating to eligibility as may be made by Defendant here are necessarily merely cumulative with those already considered, and rejected, by the Patent Examiners in allowing the Decapolis Patents.  *See, e.g., Technology Licensing Corp. v. Videotek, Inc.,* 545 F.3d 1316, 1337 (Fed. Cir. 2008); *Stone Basket,* 892 F.3d at 1179.

19.     As further evidence of the unconventionality of the technological solutions captured in the claims of the Decapolis Patents as of 1999, the United States of America, Department of the Army even cites to the Decapolis Patents.

20.     As noted, the claims of the Asserted Patent Claims have priority to at least December 18, 1999.

21.     The claims of the Asserted Patents are not drawn to laws of nature, natural phenomena, or abstract ideas.  Although the systems and methods claimed in the Asserted Patents are ubiquitous now (and, as a result, are widely infringed), the specific combinations of elements, as recited in the claims, were not conventional or routine at the time of the invention.

22.     Further, the claims of the Asserted Patents contain inventive concepts.  Even if a court ruled the underlying aspects to be abstract, the inventive concepts disclosed in sufficient detail would transform the claims into patent-eligible subject matter.

23.     The claims of the Decapolis Patents were investigated by the Patent Examiners in fields exactly relevant to the patented inventions.

24.     More specifically, the Patent Examiners performed for patent eligibility, including novelty, an analysis of the claims of the Decapolis Patents in at least the 600/300 (Diagnostic Testing), 705/2-4 (Health care management; Healthcare record management; and Patient record management), and 715/530 (Data Processing)

25.     As further evidence of the inventive nature of the inventions claimed in the Decapolis Patents, the Decapolis Patents each had at least 135 citations before being issued as valid and enforceable patents.

26.     After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiners allowed all of the claims of the Decapolis Patents to issue.  In so doing, it is presumed that Examiners used their knowledge of the art when examining the claims. *See K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Patent Examiners had experience in the field of the invention, and that the Patent Examiners properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

27.     The claims of the Decapolis Patents are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  *See* 37 C.F.R. § 1.56(b) (information is material to patentability when it is not cumulative to information already

of record in the application); *see also AbbVie Deutschland GmbH v. Janssen Biotech,* 759 F.3d 1285, 1304 (Fed. Cir. 2014); *In re DBC,* 545 F.3d 1373, 1382 (Fed. Cir. 2008).  Likewise, the claims of the Decapolis Patents are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by the Examiners.  *See, e.g., St. Clair I.P. Consultants v. Canon, Inc.,* 2011 WL 66166 at *6 (Fed. Cir. 2011); *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002); *In re Koninklijke Philips Patent Litigation,* 2020 WL 7392868 at *19 (N.D. Cal. 2020); *Standard Oil v. American Cyanamid,* 774 F.2d 448, 454 (Fed. Cir. 1985) (persons of ordinary skill are presumed to be aware of all pertinent prior art).

28.     The claims of the Asserted Patents were all properly issued and are valid and enforceable for the respective terms of their statutory life through expiration and are enforceable for purposes of seeking damages for past infringement even post-expiration. *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.,* 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.'  Much to the contrary, a patent does have value beyond its expiration date. For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286.") (internal citations omitted).

## THE ACCUSED INSTRUMENTALITIES

29. Upon information and belief, Epic makes, sells, advertises, offers for sale, uses, or otherwise provides a plurality of services, including but not limited to:

> i.      Epic Software: On information and belief, the Epic Software solution and services provide, among other things, electronic health or medical records for, including but not limited to, providers, patients, and agents.



Figures 1 and 3 – Screenshots of Defendant's Software and Services webpages as visited on April 27, 2021 and located at https://www.epic.com/software and https://www.epic.com/services.

ii.      Epic MyChart and MyChart Bedside:  On information and belief, with the Epic MyChart and MyChart Bedside solutions and platforms patients "can message their doctors, attend e-visits, complete questionnaires, schedule appointments" and if hospitalized can "stay in touch with their care team, review their schedule, access personalized patient education materials, and request help."

## Patient Experience

Give patients the tools to be healthier with MyChart, Epic's patient portal





Patients have personal and family health information at their fingertips with MyChart. They can message their doctors, attend e-visits, complete questionnaires, schedule appointments, and be more involved in managing their health.

Patients in the hospital can use MyChart Bedside to stay in touch with their care team, review their schedule, access personalized patient education materials, and request help.

Prospective patients can become new patients through easy online scheduling with MyChart.

Figure 4 – Screenshot of Defendant's webpage for the MyChart and Bedside solutions and platforms as visited on April 27, 2021 and located at https://www.epic.com/software#PatientEngagement.

iii.      EpicCare: On information and belief, EpicCare solution and platform allows, among other things, predictive analysis, embedded decision making, and recruit study participants.

## Clinicals

Help improve your patients' health and care with EpicCare

**Tailored to fit**
Screens, workflows and specialty applications are fast, flexible and can be personalized.

**Deliver safe and high-quality care**
Predictive analytics and embedded decision support tools support clinical practice to yield better outcomes.

**Help your physicians thrive**
Common tasks are streamlined to get the job done fast. Mobile apps keep you connected wherever you go.

**Discovery**
Recruit study participants more quickly; conduct independent research and incorporate your findings into clinical care.

**Productivity**
Rated by healthcare providers as the best acute and best ambulatory EMR for physician productivity and effectiveness.

Figure 5 – Screenshot of Defendant's webpage for the EpicCare solution and platform as visited April 27, 2021 and located at https://www.epic.com/software#Clinicals.

   iv.  Epic Haiku, Canto and Epic Mobile Applications for its Software and Services:



Figure 6 – Screenshot of Defendant's webpage for the Haiku, Canto and Epic Mobile Applications as visited April 27, 2021 and located at https://www.epic.com/software#Mobile.

   v.  Epic Telehealth: On information and belief, the Epic Telehealth solution and platform provides, among other things, referral services, patient monitoring, peer-to-peer consultation, and on-going patient care through telecommunications.

Figure 7 – Screenshot of Defendant's webpage for the Telehealth solution and platform as visited April 27, 2021 and located at https://www.epic.com/software#Telehealth.

        vi.        Epic Revenue Cycle: On information and belief, the Epic Revenue Cycle solution and platform allows , among other things, a doctor to "[d]eeply engage with patients, maximize revenue, protect your payments."

## Revenue Cycle

Deeply engage with patients, maximize revenue, protect your payments

 Speed up patient payments and free up staff time with paperless billing, online bill-pay, self-service payment plans, reliable pre-payments based on estimates, financial assistance, and more.

 Consolidate all of a patient's outstanding balances - hospital, physician, and post-acute bills - into a single statement to simplify and improve the patient financial experience.

 Automate revenue and coding from clinical activity to reduce administrative overhead, avoid missing charges, reduce A/R days, and increase total revenue.

 Encourage the most clinically effective and cost efficient treatments with integrated clinical and financial decision support.

Figure 8 – Screenshot of Defendant's webpage for the Revenue Cycle solution and platform as visited on April 27, 2021 and located at https://www.epic.com/software#RevenueCycle.

        vii.        Epic Managed Care: On information and belief, the Epic Managed Care solution and platform allows, among other things, a doctor "flexibility to support all your lines of business" including enrollment and eligibility, portals, care management, customer service management, utilization management, and claim adjudication and billing.



Figure 9 – Screenshot of Defendant's webpage for the Managed Care solution and platform as visited April 27, 2021 and located at https://www.epic.com/software#ManagedCare.

       viii.      Epic Planet Health: On information and belief, the Epic Planet Health solution and platform allows a doctor to, among other things, "[g]ive external providers tools to review and resolve care gaps through a web-based care management portal."



Figure 10 – Screenshot of Defendant's webpage for the Planet Health solution and platform as visited April 27, 2021 and located at https://www.epic.com/software#PopulationHealth.

       ix.      Epic Cosmos: On information and belief, the Epic Cosmos solution and platform allows a doctor to, among other things, "participat[e] [with] hundreds of organizations combining data from hundreds of millions of patients, [sic] improve the health and lives of people everywhere."



Figure 11 – Screenshot of Defendant's webpage for the Cosmos solution and platform as visited April 27, 2021 and located at https://www.epic.com/software#Cosmos.

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS      16

x.      And all augmentations to these named Epic platforms or descriptions of platforms.

Collectively, all of the foregoing are referred to herein as the "Accused Instrumentalities."

## COUNTERCLAIM I
### Infringement of U.S. Patent No. 7,490,048

30.     Decapolis incorporates the above paragraphs 1 through 29 by reference.

31.     Epic has been on actual notice of the '048 Patent at least as early as the date it received service of the Original Complaint in this litigation.

32.     The damages period begins at least as early as six years prior to the date of service of the Original Complaint in this litigation.

33.     Upon information and belief, Epic owns, directs, and/or controls the operation of the Accused Instrumentalities and generates substantial financial revenues and benefits therefrom.

34.     Upon information and belief, Epic has directly infringed and continues to directly infringe at least Claims 1, 2, 10, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, and 40 of the '048 Patent. As exemplary, Claim 20 is by making, using, importing, selling, and/or offering for sale the Accused Instrumentalities. Epic directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing systems into service by directing or controlling the systems as a whole and by obtaining the benefits therefrom. More specifically, and on information and belief, with respect to the Accused Instrumentalities, Epic: (i) executed contracts with third party servicers for the provision of archival services and databases for healthcare and related records and/or designed and assembled such archival services and databases using its own employees and/or contractors; (ii) developed, owns, and maintains digital storage archives for healthcare and related records; (iii) provides access to such records via its own branded Internet domains and/or software applications using its own name and business

trade dress; (iv) exercises authority over the provision of such record archival services and databases; (v) openly advertises and promotes such record archival services and databases bearing its name and business trade dress to customers in the United States; (vi) authored or commissioned the preparation of computer code for accessing and retrieving stored and/or archived healthcare records via its Internet domain web pages and/or software applications; (vii) claims ownership and control over such stored and/or archived healthcare records by virtue of its corporate branding and the provision of direct access; and (viii) receives monetary benefits from the provision of such healthcare records storage, archival, and retrieval services to customers.

35.     Further on information and belief, Epic directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States, including via its Internet domain web pages and/or software applications, as well as via its internal systems and interfaces. Further, and on information and belief, Epic has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities. Such testing and/or legal compliance necessarily requires Epic to make and use the Accused Instrumentalities in an infringing manner. Still further, Epic is a direct infringer by virtue of its branding and marketing activities, which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities.

36.     More specifically, and on information and belief, Epic is making, using, and offering for sale a computer-implemented method, identified as the Accused Instrumentalities, comprising: receiving information regarding a restriction or limitation regarding an ability of a person or an entity to at least one of access, obtain, change, alter, and modify, information contained in an individuals or patients healthcare record or an individual's or patients healthcare

file, wherein the individuals or patient's healthcare record or the individuals or patient's healthcare file contains healthcare information or healthcare-related information personal to the individual or patient.

37.    As Figures 2-11 show above, Epic is making, using, and offering for sale a computer-implemented method and apparatus, identified as the Accused Instrumentalities.

38.    Additionally, the Accused Instrumentalities are specially configured such that they perform a method wherein the restriction or limitation contains information regarding at least one of a healthcare provider, a healthcare payer, a healthcare insurer, and an authorized entity, and information regarding a designated purpose for allowing each of the at least one of a healthcare provider, a healthcare payer, a healthcare insurer, and an authorized entity, to at least one of access, obtain, change, alter, and modify, the information contained in an individuals or patients healthcare record or an individual's or patient's healthcare file, wherein the designated purpose is at least one of to perform a diagnosis, to perform a diagnosis for a certain ailment, illness, or symptom, to provide a second opinion, to verify or disprove a condition or a pre-existing condition, to submit an insurance claim, and to process an insurance claim.

39.    Epic's infringing methods each separately, are storing the information regarding a restriction or limitation regarding an ability of a person or an entity to at least one of access, obtain, change, alter, and modify, the information contained in an individuals or patient's healthcare record or an individual's or patient's healthcare file; processing, with a processor, a request by a person or an entity to at least one of access, obtain, change, alter, and modify, the information contained in an individuals or patient's healthcare record or an individual's or patient's healthcare file; determining, using the information regarding the restriction or limitation, whether the person or the entity is allowed or authorized to at least one of access, obtain, change, alter, and modify,

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS                                    19

the information contained in an individual's or patient's healthcare record or an individuals or patient's healthcare file; generating a message containing at least one of information regarding the person or the entity making the request, and identification information regarding the person or the entity making the request, and further wherein the message contains an actual change, alteration, or modification, made to the information contained in an individual's or patients healthcare record or an individuals or patient's healthcare file; and transmitting the message to a communication device of the individual or patient via, on, or over, a communication network.

40.     Additionally, upon information and belief, Epic owns, directs, and/or controls the infringing method operation of the Accused Instrumentalities that includes wherein the message is transmitted to the communication device of the individual or patient at least one of during, concurrently with, at a same time as, and prior to a completion of an at least one of an accessing, an obtaining, a changing, an altering, and a modifying, of the information contained in an individuals or patient's healthcare record or an individual's or patients healthcare file by the person or the entity, or at least one of during, concurrently with, at a same time as, and prior to a completion of a processing of the request to at least one of access, obtain, change, alter, and modify, the information contained in an individuals or patient's healthcare record or an individual's or patient's health care file.

41.     On information and belief, the infringement of the Decapolis Patents by Epic has been willful and continues to be willful. Epic had knowledge of the Decapolis Patents, including but not limited to at least one or more of the following:

i.      The '048 Patent, which claims priority to the '040 Patent, has been cited as prior art in connection with the examination of at least Epic's subsequently-issued U.S. Patent Application No. US20060117021A1.

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS                                  20

ii.      Through the filing and service of this Complaint.

42.     In addition or in the alternative, Epic had knowledge and continues these actions and it indirectly infringes by way of inducing direct infringement by others and/or contributing to the infringement by others of the '048 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, infringing services for use in systems that fall within the scope of at least Claims 1, 2, 10, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, and 40 of the '048 Patent. This includes without limitation, one or more of the Accused Instrumentalities by making, using, importing offering for sale, and/or selling such services, Epic injured Decapolis and is thus liable to Decapolis for infringement of the '048 Patent under 35 U.S.C. § 271.

43.     With knowledge of the Decapolis Patents, Epic induced infringement under Title 35 U.S.C. § 271(b). Epic performed actions that induced infringing acts that Epic knew or should have known would induce actual infringements. *See Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed.Cir.1990), quoted in *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed.Cir.2006) (*en banc* in relevant part). "[A] finding of inducement requires a threshold finding of direct infringement—either a finding of specific instances of direct infringement or a finding that the accused products necessarily infringe." *Ricoh,* 550 F.3d at 1341 (citing *ACCO Brands, Inc. v. ABA Locks Manufacturer Co.*, 501 F.3d 1307, 1313, (Fed. Cir. 2007).

44.     Decapolis will rely on direct and/or circumstantial evidence to prove the intent element. *See Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005) ("A patentee may prove intent through circumstantial evidence."); *Water Techs. Corp. v. Calco, Ltd.*,

850 F.2d 660, 668 (Fed. Cir. 1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").

45.     Epic has taken active steps to induce infringement, such as advertising an infringing use, which supports a finding of an intention for the accused product to be used in an infringing manner. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005) (explaining that the contributory infringement doctrine "was devised to identify instances in which it may be presumed from distribution of an article in commerce that the distributor intended the article to be used to infringe another's patent, and so may justly be held liable for that infringement").

46.     In addition, on information and belief, and based in part upon the clear infringement by the Accused Instrumentalities, Epic has a practice of not performing a review of the patent rights of others first for clearance or to assess infringement thereof prior to launching products and services.

47.     On information and belief, the infringement of the Decapolis Patents by Epic has been willful and continues to be willful. Epic had knowledge of the Decapolis Patents, including but not limited to at least one or more of the following:

i.      The '048 Patent, which claims priority to the '040 Patent, has been cited as prior art in connection with the examination of at least Epic's U.S. Patent  Application No. US20060117021A1.

ii.      Through the filing and service of this Complaint.

48.     As such, Epic has been willfully blind to the patent rights of Decapolis.

49.     The foregoing infringement on the part of Epic has caused past and ongoing injury to Decapolis. The specific dollar amount of damages adequate to compensate for the infringement

shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the Decapolis Patents.

50.      Each of Epic's aforesaid activities have been without authority and/or license from Decapolis.

## COUNTERCLAIM II
## Infringement of U.S. Patent No. 7,464,040

51.      Decapolis incorporates the above paragraphs 1 through 29 by reference.

52.      Epic has been on actual notice of the '040 Patent at least as early as the date it received service of the Original Complaint in this litigation.

53.      The infringement damages period begins at least as early as six years prior to the date of service of the Original Complaint in this litigation.

54.      The '040 patent application claims the benefit of priority of U.S. Provisional Patent Application Ser. No. 60/286,422, filed April 25, 2001, titled "APPARATUS AND METHOD FOR PROCESSING AND/OR FOR PROVIDING HEALTH CARE INFORMATION AND/OR HEALTHCARE-RELATED INFORMATION," the subject matter and teachings of which are hereby incorporated by reference herein.

55.      Upon information and belief, Epic owns, directs, and/or controls the operation of the Accused Instrumentalities and generates substantial financial revenues and benefits therefrom.

56.      Upon information and belief, Epic has directly infringed and continues to directly infringe at least Claims 1 and 46 of the '040 Patent by making, using, importing, selling, and/or offering for sale the Accused Instrumentalities. Epic directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing systems into service by directing or controlling the systems as a whole and by obtaining the benefits therefrom. More specifically, and on information and belief, with respect to the Accused Instrumentalities,

Epic: (i) executed contracts with third party servicers for the provision of archival services and databases for healthcare and related records and/or designed and assembled such archival services and databases using its own employees and/or contractors; (ii) developed, owns, and maintains digital storage archives for healthcare and related records; (iii) provides access to such records via its own branded Internet domains and/or software applications using its own name and business trade dress; (iv) exercises authority over the provision of such record archival services and databases; (v) openly advertises and promotes such record archival services and databases bearing its name and business trade dress to customers in the United States; (vi) authored or commissioned the preparation of computer code for accessing and retrieving stored and/or archived healthcare records via its Internet domain web pages and/or software applications; (vii) claims ownership and control over such stored and/or archived healthcare records by virtue of its corporate branding and the provision of direct access; and (viii) receives monetary benefits from the provision of such healthcare records storage, archival, and retrieval services to customers.

57.     Further on information and belief, Epic directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States, including via its Internet domain web pages and/or software applications, as well as via its internal systems and interfaces. Further, and on information and belief, Epic has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities. Such testing and/or legal compliance necessarily requires Epic to make and use the Accused Instrumentalities in an infringing manner. Still further, Epic is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities.

58.     More specifically, and on information and belief, the Accused Instrumentalities, each separately, receives information regarding an individual, wherein the information regarding an individual is transmitted from a first computer or from a first communication device, wherein the first computer or the first communication device is associated with a healthcare provider, wherein the information regarding an individual is transmitted via, on, or over, at least one of the Internet and the World Wide Web, wherein the information regarding an individual contains information regarding at least one of a symptom, an examination finding, a diagnosis, a treatment, an administration of a treatment, and a procedure; a database or a memory device, wherein the database or the memory device is associated with the receiver and is located at a location remote from the first computer or remote from the first communication device, wherein the database or the memory device stores information regarding a plurality of individuals, a plurality of healthcare providers, and a plurality of healthcare insurers or healthcare payers.

59.     The Accused Instrumentalities each separately, use the information regarding a plurality of individuals, a plurality of healthcare providers, and/or a plurality of healthcare insurers or healthcare payers, which includes a healthcare record or a healthcare history of, for, or associated with, each individual of a plurality of individuals, along with a healthcare record or a healthcare history of, for, or associated with, the individual, information regarding a healthcare practice of, and an insurance accepted by, each of the plurality of healthcare providers, including information regarding a healthcare practice of, and an insurance accepted by, the healthcare provider, information for processing or for storing information regarding a healthcare diagnosis or a healthcare treatment, and information for submitting an insurance claim to a healthcare insurer or a healthcare payer associated with the individual.

60.     Upon information and belief, Epic owns, directs, and/or controls the operation of the Accused Instrumentalities that includes a processing device, wherein the processing device processes the information regarding an individual, and further wherein the processing device processes information for at least one of storing the information regarding an individual in the database or the memory device and updating the healthcare record or the healthcare history of, for, or associated with, the individual, and further wherein the processing device automatically generates an insurance claim in response to the storing of the information regarding an individual in the database or the memory device or the updating of the healthcare record or the healthcare history of, for, or associated with, the individual, wherein the insurance claim is suitable for being automatically submitted to the healthcare insurer or the healthcare payer associated with the individual or is suitable for being automatically transmitted to a second computer or to a second communication device, wherein the second computer or the second communication device is associated with the healthcare insurer or the healthcare payer associated with the individual, and further wherein the processing device transmits the insurance claim to the second computer or to the second communication device.

61.     As Figures 2-11 show above, Epic is making, using, and offering for sale a computer-implemented method and apparatus, identified as the Accused Instrumentalities.

62.     On information and belief, the infringement of the Decapolis Patents by Epic has been willful and continues to be willful. Epic had knowledge of the Decapolis Patents, including but not limited to at least one or more of the following:

i.      The '040 Patent, has been cited as prior art in connection with the examination of at least Epic's U.S. Patent  Application No. US20060117021A1.

63.     Through the filing and service of this Complaint.

64.     In addition or in the alternative, with knowledge of the Decapolis Patents, Epic induced direct infringement by others and/or contributing to the infringement by others of the '040 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, infringing services for use in systems that fall within the scope of at least Claims 1 and 46 of the '040 Patent. This includes without limitation, one or more of the Accused Instrumentalities by making, using, importing offering for sale, and/or selling such services, Epic injured Decapolis and is thus liable to Decapolis for infringement of the '040 Patent under 35 U.S.C. § 271.

65.     Epic has and continues to actively induce infringement under Title 35 U.S.C. § 271(b).  Epic's actions induced infringing acts that Epic knew or should have known would induce actual infringements. *See Manville Sales Corp. v. Paramount Sys., Inc*., 917 F.2d 544, 553 (Fed.Cir.1990), quoted in *DSU Med. Corp. v. JMS Co*., 471 F.3d 1293, 1306 (Fed.Cir.2006) (*en banc* in relevant part). "[A] finding of inducement requires a threshold finding of direct infringement—either a finding of specific instances of direct infringement or a finding that the accused products necessarily infringe." *Ricoh,* 550 F.3d at 1341 (citing *ACCO Brands, Inc. v. ABA Locks Manufacturer Co*., 501 F.3d 1307, 1313, (Fed. Cir. 2007).

66.     Decapolis will rely on direct and/or circumstantial evidence to prove the intent element. *See Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005) ("A patentee may prove intent through circumstantial evidence."); *Water Techs. Corp. v. Calco, Ltd*., 850 F.2d 660, 668 (Fed. Cir. 1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").

67.     If Epic continues these actions as of this Complaint, Epic will have taken active steps to induce infringement, such as advertising an infringing use, which supports a finding of an intention for the accused product to be used in an infringing manner. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005) (explaining that the contributory infringement doctrine "was devised to identify instances in which it may be presumed from distribution of an article in commerce that the distributor intended the article to be used to infringe another's patent, and so may justly be held liable for that infringement").

68.     In addition, on information and belief, and based in part upon the clear infringement by the Accused Instrumentalities, Epic has a practice of not performing a review of the patent rights of others first for clearance or to assess infringement thereof prior to launching products and services.  As such, Epic has been willfully blind to the patent rights of Decapolis.

69.     The foregoing infringement on the part of Epic has caused past and ongoing injury to Decapolis.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the Decapolis Patents.

70.     Each of Epic's aforesaid activities have been without authority and/or license from Decapolis.

## **PRAYER FOR RELIEF**

WHEREFORE, Decapolis respectfully requests the Court enter judgment against Epic as follows:

1.     Declaring that Epic has infringed each of the Asserted Patents;

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS                    28

2.      Awarding Decapolis its damages suffered because of Epic's infringement of the Asserted Patents;

3.      Awarding Decapolis its costs, attorneys' fees, expenses, and interest;

4.      Awarding Decapolis ongoing post-trial royalties; and

5.      Granting Decapolis such further relief as the Court finds appropriate.

## JURY DEMAND

Decapolis Solutions, LLC demands trial by jury, under Fed. R. Civ. P. 38, on all issues in these Counterclaims.

Dated:  April 7, 2022                           Respectfully submitted,

                                                */s/ Christopher A. Honea*
                                                Christopher A. Honea
                                                *Pro Hac Vice (pending)*
                                                chonea@ghiplaw.com

                                                **GARTEISER HONEA, PLLC**
                                                119 W. Ferguson Street
                                                Tyler, Texas 75702
                                                Telephone: (903) 705-7420
                                                Facsimile: (903) 405-3999

                                                Marc J. Kesten
                                                Florida Bar No. 691801
                                                9220 NW 72nd Street
                                                Parkland, Florida 33067
                                                Tel: (954) 600-9500
                                                marc@kestenlex.com

                                                **COUNSEL FOR DEFENDANT AND
                                                COUNTERCLAIMANT,
                                                DECAPOLIS SOLUTIONS , LLC**

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS                    29

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are being served on April 7, 2022 with a copy of this document via the Court's CM/ECF system.

/s/ <i>Marc J. Kesten</i>

Marc J. Kesten
